NADA VELIMIROVIC'
P.O. BOX 16247, OAKLAND, CA 94610
510-459-4614
nadavel@yahoo.com

**FILED**

MAY 29 2019

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA
OAKLAND OFFICE

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| NADA VELIMIROVIC', <br><br> Plaintiff, <br> v. <br><br> WELLS FARGO & COMPANY, <br> and WELLS FARGO BANK, <br> N.A., <br><br> Defendants. | Case No. **C19-2965** <br><br> **COMPLAINT FOR DAMAGES** <br><br><br> **DEMAND FOR JURY TRIAL** |

**COMPLAINT**

1.  Comes now Plaintiff NADA VELIMIROVIC' who alleges as follows against Defendants

Wells Fargo & Company and Wells Fargo BANK, N.A.:

## JURISDICTION AND VENUE

2.   The Court has original jurisdiction over the subject matter of this complaint pursuant to 28 U.S.C.§1331 and 28 U.S.C.§1343.

3.   The Court has jurisdiction over Plaintiff's claim set forth in this Complaint under 28 U.S.C. § 1367 pursuant to its supplemental jurisdiction to hear related state law claims.

4.   The state claims alleged herein arose from a common nucleus of operative fact, are related to the federal claims such that they form part of the same case or controversy, and the actions would ordinarily be expected to be tried in one judicial proceeding.

5.   Venue is proper in this Court under 28 U.S.C. §1391(b) because Defendants reside in this district and because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

## INTRADISTRICT ASSIGNMENT

6.   Assignment to the Oakland/San Francisco division is proper because Wells Fargo & Company is headquartered in San Francisco, California and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred there.

## PARTIES

7.   Plaintiff NADA VELIMIROVIC', is an individual and at all relevant times has resided at 627 Santa Ray Avenue, Oakland, California 94610.

8.   Defendant Wells Fargo & Company, is a Delaware corporation headquartered in San

Francisco, California, and a registered bank holding company that owns and controls Defendant Wells Fargo Bank, N.A.

9.  Plaintiff is informed and believes and thereon allege that Defendant Wells Fargo BANK, N.A. (Hereinafter "Wells Fargo"), is a national bank association with a principal place of business in Sioux Falls, South Dakota, is the successor in interest to Wachovia Mortgage, FSB, who in turn was the successor in interest to the originator of the Subject Loan, World Savings Bank, FSB.

10. For purposes of this complaint, Plaintiff will use "Wells Fargo" to refer to Wells Fargo & Company and to Wells Fargo Bank, N.A., since Wells Fargo & Company and Wells Fargo share responsibility for ensuring that the Bank's operations were properly tested to ensure contract compliance and compliance with any and all state and federal government requirements and regulations.

11. Defendant Wells Fargo may be served with process through its registered agent, Corporation Service Company, at 707 WILSHIRE BOULEVARD, LOS ANGELES CA 90017.

12. Plaintiff is informed and believes, and there upon alleges that while the specific acts and omissions referenced herein may have first been committed by Wachovia, liability is imputed upon Wells Fargo, as their successor to interest.

## FACTS COMMON TO ALL CAUSES OF ACTIONS

13. On or about June 23, 2005, Plaintiff executed a promissory note in the principal sum of $750,000 (the "Note"), which was made payable to World Savings Bank, FSB.  The Adjustable Rate Mortgage Note is a "Pick-A-Payment" Loan with biweekly payments.

14. The Note is secured by a recorded deed of trust encumbering the real property located at 627 Santa Ray Avenue, Oakland, California 94610. The Note also stipulates the dates that payments will change, specifically every 52 weeks.

15. Plaintiff is informed, and believes, and thereupon alleges that nothing in the mortgage Note or deed of trust ("DOT") authorizes either the borrower or the lender to unilaterally alter the loan terms.

16. On or about December 31, 2007, World Savings Bank, FSB charter and bylaws were amended to change its name to Wachovia Mortgage, FSB.

17. On or about November 1, 2009, Wachovia converted to a national bank with the name Wells Fargo BANK South West National Association. On the same date, Wachovia merged with and into Wells Fargo BANK.

18. The loan number associated with Plaintiff's mortgage with World Savings Bank was 0029240934. The loan number associated with Plaintiff's mortgage with Wachovia Bank was also 0029240934. The loan number associated with Plaintiff's mortgage changed with Wells Fargo to 0482682291.

19. Plaintiff is informed, and believes, and thereon alleges that neither WORLD SAVINGS, or WACHOVIA or Wells Fargo BANK has ever approved a loan modification on her mortgage (e.g. loan number 0029240934; World Savings/Wachovia; loan number 0482682291 (Wells Fargo).

20. Plaintiff alleges that the original terms of the "Deed of Trust" and the Note are still enforce as of the date of her signature on the "Deed of Trust" and the the Note.

## A. Deed of Trust and Note Violation

21. Plaintiff is informed and believes and thereupon alleges that neither Wells Fargo or Wachovia Bank offered the "Pick-A-Pay" loan type and thus, their proprietary loan management systems had to be "re-programmed" to account for the World Savings Loan "pick-a-pay loan type." Rather than pre-program their loan management systems to account for the "three tier opt-in", Wachovia simply eliminated the three tier option and forced the Plaintiff to pay one payment. This change occurred without notice to Plaintiff.

22. On June 23, 2005, Wachovia offered Plaintiff a "Pick–a–Payment" loan—a monthly, adjustable-rate mortgage that allowed Plaintiff to choose one of various payment arrangements, based on a minimum payment amount determined by Plaintiff. Plaintiff accepted the $750,000 loan, and her monthly mortgage payment was approximately $1,396.78.

23. The Pick-a-Payment mortgage product allows consumers to select among three payment plans. The first allows consumers to pay more than would be necessary to pay off the mortgage in thirty years, thus reducing the term of the mortgage. The second requires standard payments based on the thirty-year term. The third requires only an interest only payment.

24. Section 3(C) Payment Change Dates section of Plaintiff's Note provides:

> My biweekly payment will change as required by Section 3(D) begining on the 24th day of July, 2006 and every 52 weeks thereafter. Each of these dates is called a "Payment Change Date."...

25. On or about November, 2008, Wells Fargo changed Plaintiff's $1,710.23 dollars bi-weekly payment to $2,247.89 dollars, disallowing her the ability to make an interest only payment.

26. Plaintiff is informed and believes and thereupon alleges that on or before November, 2008

COMPLAINT FOR DAMAGES
CASE NO.

Wells Fargo removed the three tier option from the loan statement.

27. Plaintiff is informed and believes and thereupon alleges that Wells Fargo did not send notice of the payment change amount that was implemented in November, 2008.

28. Plaintiff is informed and believes and thereon alleges that a bi-weekly payment of around $2,284.69 was not to take effect until July, 2012, not in November, 2008.

| Month/Year | Bi-Weekly | Monthly Total | Bi-Weekly Difference Between Pmts | Monthly Difference Between Pmts |
|---|---|---|---|---|
| July, 2005 | $1,396.78 | $2,793.56 | 0 | 0 |
| July, 2006 | $1,479.97 | $2,959.94 | $83.19 | $166.38 |
| July, 2007 | $1,590.96 | $3,181.92 | $110.99 | $221.98 |
| July, 2008 | $1,710.23 | $3,420.46 | $119.27 | $238.54 |
| October, 2008 | $1,710.23 | $3,420.46 | $0.00 | $0.00 |
| November, 2008 | $2,338.60 | $4,677.20 | $628.37 | $1,256.74 |

29. The above chart shows that Wells Fargo increased Plaintiff's bi-weekly mortgage payment of $1,710.23 in October, 2008 to $2,338.60 in November, 2008. Her monthly total increased from $3,420.46 in October, 2008 to $4,677.20 in November, 2008. The bi-weekly difference between payment increased from $119.27 in October, 2008 to $628.37. The monthly difference between payments increased from $238.54 to $1,256.74.

30. Plaintiff is informed and believes and thereon alleges that her mortgage is "tied" to the Certificate of Deposit Index (CODI), which was the 12-month average of the monthly average yields on the nationally published secondary market 3-Month Certificate of Deposit rates from 1985 to 2013. Information on monthly yields on 3-month certificates of deposit (secondary market) is published by the Federal Reserve Board. The Federal Reserve ceased publication of

COMPLAINT FOR DAMAGES
CASE NO.

the underlying secondary market CD rates that comprise CODI on December 16, 2013.

31. What can be seen in the chart below, is that there was not a significant change in the CODI that would have necessitated such an enormous increase in Plaintiff's bi-weekly payment from October, 2008 to November, 2008.  In fact, the index be shown in a downward trend.



**ARM Indexes: Cost of Deposits Index (CODI), 1985-2013 from Jan 2005 to Jun 2013**
*See Table Data*

*Source*:  https://www.hsh.com/mortgage-rates/arm-indices/cost-of-deposits-index.html

32. Due to the bi-weekly payment increases, Plaintiff missed the bi-weekly payment on or about July 19, 2010.  Plaintiff also missed the August 2, 2010, and the August 16, 2010 bi-weekly payments.

33. On January 14, 2011, after two years of attempting to pay the increased amount, Plaintiff filed for Chapter 13 Bankruptcy protection in order to save her home.  The plan was confirmed on March 17, 2011.

34.  Plaintiff is informed and believes and thereon alleges that Wells Fargo modified the terms of her original loan without her request, without notice to her, and without her acceptance.

COMPLAINT FOR DAMAGES
CASE NO.

## B.  Mortgage Loan Transfers and System Servicing Errors

29. Plaintiff is informed and believes and thereupon alleges that "loan boarding", is the process by which a loan and its account data is transferred from one management system to another.

30.  Plaintiff is informed and believes and thereupon alleges that transferring mortgage loans is not without error and often yield data integrity issues.  Loan boarding includes complex processes and involves multiple computer system platform:  "Boarding loans is as challenging as changing the tires on a car that is moving at 65 miles per hour… and involves the laborious manual tasks of having to re-enter data in Microsoft Excel, Word and other platforms." *Source*: https://www.bsifinancial.com/thoughts_boarding.aspx

31.  Plaintiff is informed and believes and thereupon alleges that loan boarding hinges on having a skilled team of loan boarding specialists using computing technology and well-documented business processes. An experienced loan boarding team consists of specialists knowledgeable in all aspects of loan servicing, and who have demonstrated the ability to calibrate internal procedures to ensure successful loan servicing transfers.

32. Plaintiff is informed and believes and thereupon alleges that data integrity is the key to successful error free loan transfers and boarding.  "Garbage in. Garbage out" is the mantra of many a computer system data quality analyst or engineer.  If you can't rely on some of the data in your system, can you rely on any of it?

33. Plaintiff is informed and believes and thereupon alleges that when transferring loan documents from one lender's system to another, the mortgage documents need to go into some type document repository system where the data needs to be extracted. At a minimum, the data

needs to be validated against what's on the actual mortgage before the transfer and what the

mortgage loan data is after the transfer.   At a minimum, the data needs to be validated against

what's on the actual mortgage documents.

34. Plaintiff is informed and believes and thereupon alleges that in a loan transfer from one

loan management system to another, the mortgage file often comes over as a single-PDF binary

large object file (BLOB) of 500-1,000 pages. The acquiring servicer knows whose loan it is but

not which documents are included in each file or if the data is accurate. To effectively manage

electronic mortgage documents and BLOB files, it is necessary to use advanced document

scanning and capture software that includes document classification, optical character recognition

(OCR) and workflow automation technology.

35. Plaintiff is informed and believes and thereupon alleges that Wachovia engaged in a

"stare and compare" process when Plaintiff's loan was transferred from World Savings loan

management system to the Wachovia loan management system and could not have used

advanced document scanning and capture software to manager the loan transfer. Rather,

Wachovia relied on manual data entry by humans who were not adequately trained on the

complex loan transfer business processes.

36. Plaintiff is informed and believes and thereupon alleges that Wells Fargo engaged in a

manual "stare and compare" process when Plaintiff's loan was transferred from Wachovia's loan

management system to the Wells Fargo  loan management system.  Wells Fargo relied on manual

data entry by humans who were not adequately trained on the complex loan transfer business

processes or the systems used to transfer and service the loans.

37. On March 23, 2010, Well Fargo Bank Senior Vice President, Mary Reeder sent to

Plaintiff a letter regarding the transfer of ownership of the mortgage as a result of the merger of Wachovia Bank with Wells Fargo - "Re: Notice of transfer of your mortgage Loan number 0029240934." The letter stated "**Please understand that these transfers are normal business practices, and they do not affect any of the terms of your mortgage.**"

38. On March 29, 2010, Plaintiff received a Wells Fargo letter that stated that "Over the weekend of April 24, 2010, Wachovia banking locations in California will become Wells Fargo stores, and **many Wachovia accounts opened in California will convert to Wells Fargo accounts**. However, your mortgage loan will continue to be serviced by Wachovia Mortgage, a division of Wells Fargo Bank, N.A."

39. On May 8, 2014, Wells Fargo sent a letter to Plaintiff stating that "your account statement for January may not have displayed the most recent transaction activity… **"the error did not impact the servicing of your loan... We're working to resolve the issue before your next statement generates.**

40. On December 31, 2014, the **Plaintiff's past due loan balance increased from $54,757.80 to $132,437.78**.

41. On August 20, 2015, Wells Fargo Vice President Carolyn Romo, Wells Fargo Home Mortgage, sent to Plaintiff a letter with subject: "Important information about the servicing of your Wells Fargo Home Mortgage account." The letter stated, in part:

  a. "**We're writing to let you know about an upcoming change to the system within Wells Fargo Home Mortgage** that may temporarily impact access to the mortgage account information for the above account….we'd like to assure that this one-time operational change will not affect the mortgage payments, the due dates for those payments, or the payment history."

  b. "**We're simply moving the mortgage account from one of our systems to another.**"

42. On August 31, 2015, the **past due balance increased from $56,942316 to $102,555.44 dollars.**

43. On September 4, 2015, the **past due balance increased from $50,883.60 to $243,132.70 dollars.**

44. On September 7, 2015, **past due balance increased from $243,132.70 to $246,150.99 dollars.**

45. On October 1, 2015, the **past due balance increased from $246,150.99 to $249,169.48 dollars.**

46. Plaintiff is informed and thereupon alleges that Wells Fargo failed to provide notice of the aforementioned data integrity issues where the past due balance increased exorbitantly.

47. Plaintiff is informed and thereupon alleges that Wells Fargo failed to provide a letter or notice of explanation of how these aforementioned data integrity issues impacted her loan balance, interest calculation, escrow calculation, or may have led to an overstatement of her past due loan balance.

48. Plaintiff is informed and believes and thereupon alleges that Wells Fargo never communicated what computer system or algorithm or network, hardware, database, application, API, or software program change or malfunction caused the overstatement of her past due balance that found itself "fed" with data from another loan account (or several loan accounts with past due balances) and into her loan service data account.

49. Plaintiff is informed and believes and thereupon alleges that Wells Fargo  never communicated what actions it took to resolve the issue or what it action it would take to mitigate any future occurrence or what communication protocol if would use to notify Plaintiff of such an

occurrence.

50. On or about February 2, 2019, Plaintiff discovered that $14,068.50 of the amount she had cured in her March, 2011 Chapter 13 bankruptcy was still being included as a past due balance on her Wells Fargo November, 2018 bank loan statement.

51. Plaintiff is informed and believes and there upon alleges that from the period 2005 to 2007, World's Savings Bank operated and maintained a computer loan management operating collection system that was proprietary, which included database field names, numeric data types, and data naming conventions that were proprietary and distinct from Wachovia's computer loan management operating collection system.

52. Plaintiff is informed and believes, and there upon alleges that at the consummation of Wachovia Bank by Wells Fargo, Wachovia Bank operated and maintained a computer loan management operating collection system that was proprietary, which included database field names, numeric data types, and data naming conventions that were proprietary and distinct from Well Fargo Bank's computer loan management operating collection system.

53. Plaintiff is informed and believes and therefore alleges that Wachovia's upload of Plaintiff's World Savings loan fields were not mapped correctly and therefore from 2005 to 2007 her bi-weekly payments were treated as one "lump sum" monthly payment

## C. Mis-Application of Plaintiff's Mortgage Payments

54. Plaintiff is informed and believes and thereupon alleges that Wachovia Mortgage (now Wells Fargo) changed the payment due dates three to four times per year from 2006 to 2010, without notice to Plaintiff and violating the terms of the Deed of Trust.

55. Plaintiff is informed and believes and thereupon alleges that Wachovia Mortgage (now

Wells Fargo) then mis-applied the payments made based on the 'yearly payment amount" and applied these funds to a "suspense or unapplied funds account" no less than four times per year from 2007 to 2010.

56. Plaintiff is informed and believes and thereupon alleges that Wells Fargo sustained the aforementioned practice of date payment change and then mis-applied the payments made based on the "yearly payment amount" and applied these funds to a "suspense or unapplied funds account" no less than four times per year from 2010 to 2018.

57. On information and belief, Plaintiff alleges that Wells Fargo mis-application of fees and subsequent use of the unapplied funds account contributes to the application of late fees during the period from 2007 to 2018.

58. On information and belief, Plaintiff alleges that Wells Fargo did not apply a payment received in November, 2009.

59. Plaintiff is informed and believes and thereupon alleges that Wells Fargo also misapplied funds by paying late charges before paying principal, which is violation of the Deed of Trust.

60. Plaintiff is informed and believes and thereupon alleges that Wells Fargo also misapplied funds by paying late charges before paying principal, which is violation of the Deed of Trust.

61. On October 15, 2010, Plaintiff's bi-weekly home loan payment was $2,416.98.  Yet the October 15, 2010 Loan Statement showed that two payments were applied for the amount of $2,416.98 each, with a description dated October 5, 2010 of "MISC APPLY PAY." Plaintiff's full payments were misapplied and labeled miscellaneous and deemed partial payments.

62. On October 25, 2010, Wachovia Mortgage sent to Plaintiff a letter stating "your loan has been approved for commencement of foreclosure action which may cause you to lose your

property and any owner's equity.  The delinquent amount listed was $10,644.78.

63. On October 28, 2010, Plaintiff's bi-weekly home loan payment was $2,416.98.  Yet the October 28, 2010 Loan Statement showed that two payments were applied for the amount of $2,416.98 each, with a description dated October 26, 2010 of "MISC APPLY PAY." Plaintiff's full payments were misapplied and labeled miscellaneous and deemed partial payments.

64. On November 6, 2010, Plaintiff's bi-weekly home loan payment was $2,416.98.  Yet the November 6, 2010 Loan Statement showed that two payments were applied for the amount of $2,416.98 each, with a description dated November 4, 2010 of "MISC APPLY PAY." Plaintiff's full payments were misapplied and labeled miscellaneous and deemed partial payments.

65. On December 6, 2010, Plaintiff's bi-weekly home loan payment was $2,416.98.  Yet the December 6, 2010 Loan Statement showed that one payment was applied for the amount of $2,416.98 with a description dated December 3, 2010 of "MISC APPLY PAY." Plaintiff's full payment was misapplied and labeled miscellaneous and deemed a partial payment.

66. On December 7, 2010, the Wachovia Annual Escrow Account Disclosure Statement showed the current bi-weekly home loan payment of $2,416.98 - e.g. as the amount for a "full payment."

67. On or about December, 2011, Wachovia initiated foreclosure proceedings on Plaintiff's property, citing an estimated $14,000 arrearage which included mortgage payments and unspecified fees.

68. On or about January 3, 2011, Plaintiff made two separate payments of $2,416.98 for the January, 2011 bi-weekly payments.  On January 4, 2011, on that same day a late fee is assessed in the amount of $98.82.

69. On September 3, 2011, Plaintiff made four separate payments of $2,550.00. Wells Fargo held the $10,200.00 in the "Unapplied Funds" account for twenty-five days.

70. From September 9, 2011 to October 3, 2011, two mortgage payments became due (September 12, 2011 and September 26, 2011) and Wells Fargo did not apply any of the $10,200.00 funds from the "Unapplied Funds" Account to the September 12, 2011 or the September 26, 2011 mortgage payments. On September 27, a late charge fee of $106.23 was assessed.

71. Plaintiff is informed and believes and thereupon alleges that Wells Fargo consistently applied only partial payments when full payments were received from Plaintiff - a "pattern and practice" that began in 2008 and continues to the present day.

**D. California Civil Code Section § 2954.4 Violation**

72. California Civil Code Section § 2954.4(b) prohibits the practice of pyramiding late charges.

73. California Civil Code Section § 2954.4(b) and the Plaintiff's underlying Notes which incorporate California law, Wells Fargo is required, for purposes of assessing late charges, to apply monthly payments they receive to the most recent installment due, even if the borrower is past due for prior installments. The purpose of this requirement is to ensure that, if one payment is missed, but subsequent payments are made on time, the borrower is only charged a late charge for the single missed payment.

74. An example of pyramiding lates is where, if a borrower fails to make a timely payment in January, but makes the regular installment payment due in February, the lender charges a late charge for February, even though the payment received in February would be applied towards the

January payment and the February installment payment would still be due. Dragging that late charge into subsequent months as a penalty to the borrower would keep the borrower from getting ahead.

75. Section 7(A) of Plaintiff's Note provides:

If the Lender has not received the full amount of any biweekly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Lender.  The amount of the charge will be 5% of my overdue payment of Principal and interest.  I will pay this late charge promptly but only once on each late payment.

76. California Civil Code Section § 2954.4(b), which applies to loans secured by single-family owner-occupied dwellings, states:

(b)  A late charge may not be imposed on any installment which is paid or tendered in full on or before its due date, or within 10 days thereafter, even though an earlier installment or installments, or any late charge thereon, may  not have been paid in full when due.  For the purposes of determining whether late charges may be imposed, any payment tendered by the borrower shall be applied by the lender to the most recent installment due.

77. Thus, Section 2954.4(b) of the California Civil Code and the terms of the Note, in which this California Civil Code is incorporated, prohibits Wells Fargo from charging late fees when only one payment of principal and interest is missed or late.  In other words, these provisions are designed to prevent lenders from applying timely made payments to a previously missed or late installment so as to trigger a new late fee.

78. On May 25, 2010, a payment of $2,279.09 was received by Wells Fargo  within the fifteen day grace period, as per the Mortgage Note.  A late fee of $91.93 was assessed.

79. On June 8, 2010, a payment of $2,279.09 was received by Wells Fargo within the fifteen day grace period, as per the Mortgage Note.  A late fee of $91.93 was assessed.

80. On June 22, 2010, a payment of $2,279.09 was received by Wells Fargo within the fifteen

COMPLAINT FOR DAMAGES
CASE NO.

day grace period, as per the Mortgage Note.  A late fee of $91.93 was assessed.

81. On July 6, 2010, a payment of $2,279.09 was received by Wells Fargo within the fifteen day grace period, as per the Mortgage Note.  A late fee of $91.93 was assessed.

82. On July 19, 2010, a payment was not received by Wells Fargo but a late fee of $91.93 was assessed on July 20, 2010

83. On August 2, 2010, a payment was not received by Wells Fargo but a late fee of $98.82 was assessed on August 3, 2010.

84. On August 16, 2010, a payment was not received by Wells Fargo but a late fee of $98.82 was assessed on August 17, 2010.

85. On September 14, 2010, a payment of $2,416.98 was received by Wells Fargo within the fifteen day grace period.  A late  fee of $98.82 was assessed on September 28, 2010.

86. On October 5, 2010, a payment of $4,833.96 was received by Wells Fargo.  On October 12, 2010, a late fee of $98.82 was assessed.

87. On October 11, 2010, a payment was not received by Wells Fargo but a late fee of $98.82 was assessed on October 12, 2010.

88. On October 26, 2010, a payment of $2,416.98 was received by Wells Fargo and on the same day (October 26, 2010), a late fee of $98.82 was assessed.

89. On November 4, 2010, a payment of $4,833.96 was received by Wells Fargo.  On November 9, 2010, a late fee of $98.82 was assessed.

90. On December 3, 2010, a payment of $2,416.98 was received by Wells Fargo.  On December 7, 2010, a late fee of $98.82 was assessed.

91. On December 20, 2010, a payment was not received by Wells Fargo but a late fee of

$98.82 was assessed on December 21, 2010.

92. On or about January 3, 2011, Plaintiff made two separate payments of $2,416.98 for the January, 2011 bi-weekly payments. On January 4, 2011, on that same day a late fee is assessed in the amount of $98.82.

93. On January 17, 2011, a payment was not received by Wells Fargo but a late fee of $98.82 was assessed on January 18, 2011.

94. On January 31, 2011, a payment was not received by Wells Fargo but a late fee of $98.82 was assessed on February 1, 2011.

95. On or about February 9, 2011, Plaintiff made two separate payments of $2,416.98 for the February, 2011 bi-weekly payments. On February 15, 2011, a late fee is assessed in the amount of $98.82.

96. On February 28, 2011, a payment was not received by Wells Fargo but a late fee of $98.82 was assessed on March 1, 2011.

97. On March 14, 2011, a payment was not received by Wells Fargo but a late fee of $98.82 was assessed on March 15, 2011.

98. On March 25, 2011 and on March 29, 2011, one payment each of $2,416.98 was received by Wells Fargo. On March 29, 2011, a late fee of $98.82 was assessed.

99. On or about April 7, 2011, Plaintiff made two separate payments of $2,416.98 for the April, 2011 bi-weekly payments. On April 12, 2011, a late fee is assessed in the amount of $98.82.

100.    On April 25, 2011, a payment was not received by Wells Fargo. A late fee of $98.82 was assessed on April 26, 2011.

COMPLAINT FOR DAMAGES
CASE NO.

101.     On or about May 5, 2011, Plaintiff made two separate payments of $2,416.98 for the May, 2011 bi-weekly payments.  On May 10, 2011, a late fee is assessed in the amount of $98.82.

102.     On May 23, 2011, a payment was not received by Wells Fargo.  On May 24, 2011, a late fee is assessed in the amount of $98.82.

103.     On or about June 1, 2011, Plaintiff made two separate payments of $2,416.98 for the June, 2011 bi-weekly payments.  On June 7, 2011, a late fee is assessed in the amount of $98.82.

104.     On June 16, 2011, a property inspection fee is assessed in the amount of $20.00.

105.     On June 20, 2011, a payment was not received by Wells Fargo.  On June 21, 2011, a late fee is assessed in the amount of $98.82

106.     On the July 4, 2011, a monthly payment of $2,418.35 is shown as due.  On July 5, 2011,  a late fee of $98.82 is assessed.

107.     On or about July 4, 2011, Plaintiff made two separate payments of $2,550.00 for the July, 2011 bi-weekly payments.  On July 19, 2011, a late fee is assessed in the amount of $98.82.

108.     On July 15, 2011, a property inspection fee is assessed in the amount of $20.00.

109.     From September 9, 2011 to October 3, 2011, two mortgage payments became due (September 12, 2011 and September 26, 2011) and Wells Fargo did not apply any of the $10,200.00 funds from the "Unapplied Funds" Account to the September 12, 2011 or the September 26, 2011 mortgage payments.  On September 27, a late charge fee of $106.23 was assessed.

110.     On February 7, 2012, Plaintiff made two separate payments of $2,535.01 for the February, 2012  bi-weekly payments.  On February 14, 2012, a late fee is assessed in the amount of $106.23. On February 28, 2012, a late fee is assessed in the amount of $106.23.

111.    On March 2, 2012, Plaintiff made two separate payments of $2,535.01 for the March, 2012 bi-weekly payments.  On March 13, 2012, a late fee is assessed in the amount of $106.23. On March 27, 2012, a late fee is assessed in the amount of $106.23.

112.    On April 3, 2012, Plaintiff made two separate payments of $2,550 for the April, 2012 bi-weekly payments.  On April 10, 2012, a late fee of $106.23 is assessed.  On April 24, 2012, a late fee of $106.23 is assessed.

113.    On May 4, 2012, Plaintiff made two separate payments of $2,550 for the May, 2012 bi-weekly payments.  On May 8 2012, a late fee of $106.23 is assessed.  On May 22, 2012, a late fee of $106.23 is assessed.

114.    On June 5, 2012, Plaintiff made one payment of $2,550.00.  On June 5, 2012, a late fee of $106.23 is assessed.

115.    On July 11, 2012, Plaintiff made two separate payments of $2,550.00 for the July, 2012 bi-weekly payments.  On July 17, 2012, a late fee is assessed in the amount of $106.23. On July 31, 2012, a late fee is assessed in the amount of $114.20.

116.    On August 24, 2012, Plaintiff made a payment of $2,550.00.  On August 28, 2012, a late fee is assessed in the amount of $114.20.

117.    On September 4, 2015, a late charge of $2,233.32 is added to the past due balance without notice to Plaintiff.

118.    Wells Fargo's conduct is unfair, fraudulent and violates California Civil Code Section § 2954.4(b) and the underlying Notes which necessarily incorporate California Civil Code Section § 2954.4(b).  Cumulatively, these late fees, improperly calculated and charged by Wells Fargo have resulted in substantial harm to the Plaintiff.

### E.  Property Inspections Without Notice

119.    On February 18, 2011, a property inspection fee is assessed in the amount of $20.00 dollars.

120.    On March 16, 2011, a property inspection fee is assessed in the amount of $20.00 dollars.

121.    On April 14, 2011, a property inspection fee is assessed in the amount of $20.00 dollars.

122.    On May 19, 2011, a property inspection fee is assessed in the amount of $20.00 dollars.

123.    Additional property inspection fees were incurred on January 17, 2012, February 17, 2012, March 15, 2012, April 19, 2012, and June 8, 2012.

### F.  "Pattern and Practice" of Delaying Response to Plaintiff's QWR In Order to Conceal Unlawful, Unfair, and Egregious Conduct

124.    Plaintiff is informed and believes and thereupon alleges that Wells Fargo engaged in a "pattern and practice" of delaying responses to Plaintiff's Qualified Written Requests in order to conceal unlawful, unfair, outrageous and egregious conduct.

125.     On March 24, 2016, Plaintiff emerged from the confirmed on March 17, 2011 Chapter 13 Bankruptcy.

126.    On March 24, 2016, Wells Fargo began attempting to collect on the debt it claimed as not cured - in the amount of $95,924.12  The $95,924.12 included $14,068.50 - an amount that Plaintiff had already paid during her Chapter 13 plan.

127.    Plaintiff is informed and believes and thereupon alleges that from April, 2016 and

July, 2016 she made several calls to Wells Fargo's customer service attempting to understand the basis of the $95,924.12 past due balance.

128.    On June 16, 2016, Plaintiff wrote to Wells Fargo to provide a payment history for her loan for the following time period, January 1, 2010 through June 15, 2016.

129.    On August 2, 2016, Adam Velde, Executive Resolution Specialist, Customer Care and Recovery Group, Wells Fargo, sent to Plaintiff a letter with subject: "Update to your inquiry regarding account number 0482682291 . It read:…**"It was our goal to provide you with a response by August 2, 2016. We now expect to complete our work by August 16, 2016. We appreciate your patience as we finalize our research**.

130.    On August 30, 2016, Susan Rubke, Executive Resolution Specialist, Customer Care and Recovery Group, Wells Fargo, sent to Plaintiff a letter with subject: "Update to your inquiry regarding account number 0482682291. It read:…**"It was our goal to provide you with a response by August 30, 2016. We now expect to complete our work by September 14, 2016. We appreciate your patience as we finalize our research**.

131.    On September 14, 2016, Susan Rubke, Executive Resolution Specialist, Customer Care and Recovery Group, Wells Fargo, sent to Plaintiff a letter with subject: "Update to your inquiry regarding account number 0482682291. It read:…**"It was our goal to provide you with a response by September 14, 2016. We now expect to complete our work by September 28, 2016. We appreciate your patience as we finalize our research**.

132.    On September 20, 2016, Leesa Whitt-Potter, Senior Vice President, Wells Fargo Home Lending, Wells Fargo, sent to Plaintiff a letter with subject: "Acknowledgement - receipt of inquiry regarding account number 0482682291. It read…**"We expect to complete our**

research and provide you with the results on or before 10/04/2016.

133.    On September 28, 2016, Susan Rubke, Executive Resolution Specialist, Customer Care and Recovery Group, Wells Fargo, sent to Plaintiff a letter with subject: "Update to your inquiry regarding account number 0482682291.  It read:…**"It was our goal to provide you with a response by September 28, 2016.  We now expect to complete our work by October 4, 2016.  We appreciate your patience as we finalize our research**.

134.    On October 4, 2016, Susan Rubke, Executive Resolution Specialist, Customer Care and Recovery Group, Wells Fargo, sent to Plaintiff a letter with subject: "Update to your inquiry regarding account number 0482682291.  It read:…**"It was our goal to provide you with a response by October 18, 2016.  We now expect to complete our work by October 4, 2016. We appreciate your patience as we finalize our research**.

135.    On October 12, 2016, Susan Rubke, Executive Resolution Specialist, Customer Care and Recovery Group, Wells Fargo, sent to Plaintiff a letter with subject: "Update to your inquiry regarding account number 0482682291.  It read:…**"It was our goal to provide you with a response by October 12, 2016.  We now expect to complete our work by October 26, 2016. We appreciate your patience as we finalize our research**.

136.    On October 26, 2016, Susan Rubke, Executive Resolution Specialist, Customer Care and Recovery Group, Wells Fargo, sent to Plaintiff a letter with subject: "Update to your inquiry regarding account number 0482682291.  It read:…**"It was our goal to provide you with a response by October 26, 2016.  We now expect to complete our work by November 1, 2016. We appreciate your patience as we finalize our research**.

137.    On November 9, 2016, Susan Rubke, Executive Resolution Specialist, Customer Care

COMPLAINT FOR DAMAGES
CASE NO.

and Recovery Group, Wells Fargo, sent to Plaintiff a letter with subject: "Update to your inquiry regarding account number 0482682291. It read:…**"It was our goal to provide you with a response by November 9, 2016. We now expect to complete our work by November 25, 2016. We appreciate your patience as we finalize our research**.

138.    On November 23, 2016, Susan Rubke, Executive Resolution Specialist, Customer Care and Recovery Group, Wells Fargo, sent to Plaintiff a letter with subject: "Update to your inquiry regarding account number 0482682291. It read:…**"It was our goal to provide you with a response by November 25, 2016. We now expect to complete our work by December 8, 2016. We appreciate your patience as we finalize our research**.

139.    On November 23, 2016 the Cash Stale Dates Checks Loan Servicing Department of Wells Fargo Home Mortgage sent a letter with subject "Your uncashed check". The letter stated "We're writing to let you know that a check we sent to you hasn't been cashed yet. Here are the check details, check number 7031126782, check issue date 8/15/2016, check amount of $437.77.

140.    On December 8, 2016, Susan Rubke, Executive Resolution Specialist, Customer Care and Recovery Group, Wells Fargo, sent to Plaintiff a letter with subject: "Update to your inquiry regarding account number 0482682291. It read:…**"It was our goal to provide you with a response by December 8, 2016. We now expect to complete our work by December 22, 2016. We appreciate your patience as we finalize our research**..

141.    On December 22, 2016, Susan Rubke, Executive Resolution Specialist, Customer Care and Recovery Group, Wells Fargo, sent to Plaintiff a letter with subject: "Update to your inquiry regarding account number 0482682291. It read:…**"It was our goal to provide you with a response by December 22, 2016. We now expect to complete our work by January 9,**

**2017.  We appreciate your patience as we finalize our research**.

142.    On January 9, 2017, Susan Rubke, Executive Resolution Specialist, Customer Care and Recovery Group, Wells Fargo, sent to Plaintiff a letter with subject:  "Update to your inquiry regarding account number 0482682291.  It read:…**"It was our goal to provide you with a response by January 9, 2017.  We now expect to complete our work by January 24, 2017. We appreciate your patience as we finalize our research**.

143.    On January 24, 2017, Susan Rubke, Executive Resolution Specialist, Customer Care and Recovery Group, Wells Fargo, sent to Plaintiff a letter with subject:  "Update to your inquiry regarding account number 0482682291.  It read:…**"It was our goal to provide you with a response by January 24, 2017.  We now expect to complete our work by February 7, 2017. We appreciate your patience as we finalize our research**.

144.    On January 24, 2017; Susan Rubke, Executive Resolution Specialist, Customer Care and Recovery Group, Wells Fargo, sent to Plaintiff a letter with subject:  "Resolution of the inquiry received concerning account number 0482682291.  **The letter included the following: (1) January 5, 2010 through December 31, 2010, and an account history from January 14, 2011 through July 13, 2016….Please note that we respectfully decline your request for a payment history in the form of a digital payment history."**

145.    From January 24, 2017 to February 16, 2017 Plaintiff analyzed the January 5, 2010 through December 31, 2010 and the January 14, 2011 through July 13, 2016 payment histories provided Ms. Rubke on January 24, 2017.

146.    On February 16, 2017, Plaintiff sent to Wells Fargo Executive Resolution Specialist Susan Rubke in the Customer Care and Recovery Group a fax with a written response "to your

letter of January 24, 2107, subject:  Resolution of inquiry received concerning Account Number:

0482682291".  The letter to Ms. Rubke contained several queries regarding the payment history

including:

a.  The data appears in two separate documents - one for 2010 and one for 2011 through 7/13

of 2016.  We would like to clarify that **our request is for complete information through**

**the end of December, 2016**.

b.  It is difficult to compare the two payment history documents as the formats are quite

different - with a significantly different array of columns.

c.  After a close review of the 2010 payment history, there is a problem with the recording of

payments in the summer.

i.  The two July payments were processed:  (1) effective 9/17/10 for $2,279.09, and

(2) effective 9/7/10  for $2,416.98.

ii.  Processed initially for an August 2010 due date, a payment effective 9/7/2010 for

$3,303.93 is reversed on 9/8/10 due to Non-Sufficient Funds.  However, on that

same line of 9/8/10 that shows a $3,303.93 is the amount of $1,024.84 in the

"Unapplied Funds" column.

iii.  On 9/10/10 that $1,024.84 appears as "Amount Applied to Principal" and appears

in the "Due Date" column as a July 2010 payment -HOWEVER, BOTH JULY

PAYMENTS HAD ALREADY BEEN PROCESSED.  To be clear, July 2010 had

two Mondays in it not three.   Therefore, the 9/10/10 that $1,024.84 appears as

"Amount Applied to Principal" should have ben applied to the August 2010 due

date payment.

iv.  Then on 9/14/10 $2,416.98 appears as a "Amount Received" in the "Unapplied

Funds;" on 9/16/10 $2,416.98 appears as applied to the principal, applied to the

interest, and escrow applied registered again as a July 2010 "Due Date" -

HOWEVER, AGAIN, BOTH JULY PAYMENTS HAD ALREADY BEEN

PROCESSED.

d.  After a close review of the 2011-2016 payment history, we would like an explanation of

why Wells Fargo held so many payments as "Unapplied Funds" for a months and years at

a time from 2011 through 2016.

e.  Given discrepancies in Wells Fargo's record keeping we would like further time to review

the particularly dense data concerning September 2015.  Within a two day period forty

seven (47) payments were 'deleted' as a Reversal Funds Applied" (between 7/2/2012 and

4/21/2014) and subsequently sixty three (63) payments were noted as "Unapplied Funds to

Bi-Weekly Mortgage Payment.  We need extra time to cross reference our receipts of each

wire transfer during this time period to confirm accuracy of the data.

f.  In addition, in the 2011-2016 payment history, there are multiple unexplained fees that we

would like further explanation of.  For example, a "Property Inspection Fee" was assessed

fourteen times at $20 per time and one time at $15 between 2/15/11 and 4/17/12.  Was this

total amount of $295 charged to our account?

147.  On March 7, 2017, Jeanifer Cleavenger, Executive Resolution Specialist, Customer

Care and Recovery Group, Wells Fargo, sent to Plaintiff a letter with subject:  "Update to your

inquiry regarding account number 0482682291.  It read:…**"It was our goal to provide you with

a response by March 7, 2017.  We now expect to complete our work by March 21, 2017.  We**

appreciate your patience as we finalize our research.

148.    On March 21, 2017, Jeanifer Cleavenger, Executive Resolution Specialist, Customer Care and Recovery Group, Wells Fargo, sent to Plaintiff a letter with subject: "Update to your inquiry regarding account number 0482682291. It read:…**"It was our goal to provide you with a response by March 21, 2017.  We now expect to complete our work by April 14, 2017.  We appreciate your patience as we finalize our research**.

149.    On April 3, 2017, Lisa Whitt-Potter, Wells Fargo's Senior Vice President, Wells Fargo Home Lending, sent to Plaintiff a letter with subject stating**… "It is our goal to provide you with a response by April 13, 2017…."**.

150.    On April 4, 2017, Wells Fargo sent a letter to Plaintiff stating "Year-to-Date" Summary.  It states, the "Payment Summary reflects an unpaid balance from April 4, 2016 to April 3, 2017 of $81,712.69 dollars**.**

151.    On April 4, 2017, Jeanifer Cleavenger, Executive Resolution Specialist, Customer Care and Recovery Group, Wells Fargo, sent to Plaintiff a letter with subject:  "Update to your inquiry regarding account number 0482682291.  It read:…**"It was our goal to provide you with a response by April 4, 2017.  We now expect to complete our work by April 18, 2017.  We appreciate your patience as we finalize our research**.

152.    On April 27, 2017, Jeanifer Cleavenger, Wells Fargo's Executive Resolution Specialist of the Customer Care and Recovery Group, sent to Plaintiff with subject "Update to your inquiry regarding account number 0482682291.  It read:…**"It was our goal to provide you with a response by April 27, 2017.  We now expect to complete our work by May 11, 2017.  We appreciate your patience as we finalize our research**.

COMPLAINT FOR DAMAGES
CASE NO.

153.    On April 28, 2017, Lisa Whitt-Potter, Wells Fargo's Senior Vice President, Wells Fargo Home Lending, sent to Plaintiff a letter with subject stating... **"It is our goal to provide you with a response by 05/11/17**.

154.    On May 25, 2017, Plaintiff sent to Tamm J. Laird, Clear Recon Corp. with a copy to Herman L. Counts III, Wells Fargo, Senior Vice President, Customer Care and Recovery Group, and Jeanifer/Jennifer Cleavenger, Wells Fargo Executive Resolution Specialist a letter disputing the debt and requesting responses to her questions regarding the debt.

155.    On June 06, 2017, Mauree Hurst, Wells Fargo's Executive Resolution Specialist, Customer Care and Recovery Group.  It read: ...**"It was our goal to provide you with a response by 06/06/17.  We now expect to complete our work by June 20, 2017.  We** appreciate your patience as we finalize our research.

156.    On June 19, 2017, Plaintiff filed for Chapter 13 for protection to avoid foreclosure based on the disputed debt.

157.    On June 28, 2017, Kathryn Urdovich, Wells Fargo's Executive Resolution Specialist, Customer Care and Recovery Group.  It read ...**"Your account is due for the May 01, 2016 through June 01, 2017, payments totaling $90,828.90....On April 27, 2017, we initiated foreclosure proceedings on your account, at which time your account was due for the May 01, 2016 to April 01, 2017, payments....We're unable to provide any further information because your remaining requests are too broad.  If you provide us with more specific details about what you're seeing, we'll review your request again....We have researched this matter and have been unable to find any evidence to support the issues you have raised regarding your home mortgage loan.  We appreciate your patience as we finalize our**

**research**.

158.    Plaintiff is informed and believes and thereupon alleges that Wells Fargo never answered the specific questions Plaintiff asked about in her letter to Susan Rubke.

159.    Plaintiff is informed and believes and therefore alleges that Wells Fargo took from July 24, 2016 to January 24, 2017 to provide a loan history.  That is a total of 184 days.  **The question is why did it take Wells Fargo 184 days to provide Plaintiff a loan history?  What were they attempting to conceal?**  What were they modifying in Plaintiff's loan service data file that required 184 days?

160.    After Plaintiff reviewed the loan history provided on January 24, 2017, Plaintiff had follow-up questions regarding errors she noted.  Plaintiff is informed and believes and therefore alleges that Wells Fargo took from February 16, 2017 to on or about May 29, 2017 to provide a response to her Qualified Written Request.  That is a total of 102 days.  After Plaintiff reviewed the loan history, she requested a loan history dated from loan origination (2005).  That documentation was never received by Plaintiff until February 12, 2019 - or over two and a half years later.

161.    As of the date of this complaint filing, Plaintiff's specific questions still have not been addressed.

## G.  California Civil Code Section § 2923.6 Violation

162.    California Civil Code Section § 2923.6 prohibits "dual tracking."  **Dual tracking** is an illegal process wherein a mortgage lender is requesting documents, and processing a submission for a loan modification – while also pushing the homeowner through the foreclosure process at the same time.

163.   Under California Civil Code 2923.6, a mortgage servicer, mortgagee, trustee,

beneficiary, or authorized agent shall not record a notice of default or notice of sale or conduct a

trustee's sale until any of the following occurs:

(1) The mortgage servicer makes a written determination that the borrower is not eligible
for a first lien loan modification, and any appeal period pursuant to subdivision (d) has
expired; (3) (e) If the borrower's application for a first lien loan modification is denied, the
mortgage servicer, mortgagee, trustee, beneficiary, or authorized agent shall not record a
notice of default or, if a notice of default has already been recorded, record a notice of sale
or conduct a trustee's sale until the later of: (1) Thirty-one days after the borrower is
notified in writing of the denial; (2) If the borrower appeals the denial pursuant to
subdivision (d), the later of 15 days after the denial of the appeal or 14 days after a first
lien loan modification is offered after appeal but declined by the borrower, or, if a first lien
loan modification is offered and accepted after appeal, the date on which the borrower fails
to timely submit the first payment or otherwise breaches the terms of the offer; (f)
Following the denial of a first lien loan modification application, the mortgage servicer
shall send a written notice to the borrower identifying the reasons for denial, including the
following:

(1) The amount of time from the date of the denial letter in which the borrower may
request an appeal of the denial of the first lien loan modification and instructions regarding
how to appeal the denial; (2) If the denial was based on investor disallowance, the specific
reasons for the investor disallowance; (3) If the denial is the result of a net present value
calculation, the monthly gross income and property value used to calculate the net present
value and a statement that the borrower may obtain all of the inputs used in the net present
value calculation upon written request to the mortgage servicer; (4) If applicable, a finding
that the borrower was previously offered a first lien loan modification and failed to
successfully make payments under the terms of the modified loan; (5) If applicable, a
description of other foreclosure prevention alternatives for which the borrower may be
eligible, and a list of the steps the borrower must take in order to be considered for those
options....."

164.   To wit, while a borrower's complete application for a first lien loan modification is

pending, the servicer may not record a notice of default, notice of trustee's sale, or conduct a

trustee's sale.

165.   On or About November, 2016, Plaintiff called the Wells Fargo to inquire about loss

mitigation options and to request a single point of contact.

166.    On December 30, 2016, Wells Fargo sent Plaintiff a letter with subject "Future contact information for your records." The letter, from Anthony Grant, introduced himself as the Wells Fargo Home Mortgage Home Preservation Specialist assigned to her account, with phone contact - 1-855-844-4527 extension 1335520089 and fax number 1-866-590-8910.

167.    Plaintiff is informed and believes and thereupon alleges that on or about January 6, 2017 she called Mr. Anthony Grant, the Wells Fargo Home Preservation Specialist, to discuss loss mitigation options, which included a discussion on the Home Affordable Modification Program. Mr. Grant assured her he would send he a loss mitigation packet that she was to complete and return to him. Plaintiff also asked Mr. Grant about something she had heard in the media about lenders promising to review loan modifications while on the "back-end" sending their loans through for foreclosure proceedings. Mr. Grant assured Plaintiff that her loan would not be "dual tracked."

168.    On or about January 20, 2017, Plaintiff sent to Wells Fargo the completed loss mitigation packet.

169.    On February 2, 2017, Mr. Anthony Grant sent to Plaintiff a letter with subject: Important information about your request for mortgage assistance. "I'm writing to let you know we received the documents you sent us to move forward with your request for mortgage assistance. Thank you for providing your information."

170.    On February 6, 2017, Mr. Anthony Grant sent to Plaintiff a letter (Form 708) with subject:  Important next steps for your loan modification request. The letter had two sections. The main section was titled "Document we have received that are complete":

| Document | Document Status | Document valid Until |
|---|---|---|
| Mortgage Application | Received and complete | Does Not Expire |
| Pay Stubs | Received and complete | Does Not Expire |
| Rental Agreement | Received and complete | Does Not Expire |
| Tax Returns | Received and complete | April 15, 2017 |
| Proof of Occupancy | Received and complete | April 15, 2017 |

171.    Another section of the form 708 letter called "Document" showed the following:

| Document | Document Status |
|---|---|
| Nada Velimirovic:  IRS 4506-T (Request for Tax Transcript) | Not yet received |

172.    Plaintiff is informed and believes and thereupon alleges that she sent all required documentation to Wells Fargo, in the original submission packet.  Nevertheless, she submitted to Mr. Anthony Grant the IRS 4506-T tax transcript on or about February 6, 2017.

173.    Plaintiff is informed and believes and thereupon alleges that Mr. Anthony Grant was her assigned Home Mortgage Preservation single point of contact.

174.    On February 13, 2017, Mr. Anthony Grant sent to Plaintiff a letter with subject: "Acknowledging receipt of your documentation supporting your request for mortgage assistance.....thank you for responding to our request."

175.    On February 27, 2017, Plaintiff's spouse sent to a "Kevin" - who had called them requesting Plaintiff's 2015 Tax return -  the fax as shown below:

**FAX COVER SHEET**

| TO | Kevin |
| --- | --- |
| COMPANY | Wells Fargo Mortgage Assistance Program |
| FAX NUMBER | 18665908910 |
| FROM | Gwendolyn Denise Stripling |
| DATE | 2017-02-27 02:54:57 GMT |
| RE | Supplemental Documentation-Mortgage Assistance Program- |

Loan #0482682291

COVER MESSAGE

TO: KEVIN

Phone # 877-458-8420 ext. 1335427887

Attached are the 2015 Tax Returns for Nada Velimirovic, a supplement to the Mortgage
Assistance Application by:

176.   On March 2, 2017, Plaintiff called Mr. Grant regarding the status of her loan
modification.  She did not hear back from him.

177.   On or about March 6, 2017, Plaintiff called the Wells Fargo Home Mortgage number
and asked how best to escalate to Mr. Grant's supervisor.  She was told by a Wells Fargo
Customer Representative she needed to speak to "the Executive Office."   She was put through to
another representative and a call was scheduled for Wednesday, March 8, 2017.  However, due to
a family issue, Plaintiff was not available.

178.   On March 9, 2017, Plaintiff and her spouse still sought to escalate to Mr. Grant's
supervisor since he had still not returned her phone calls or provided any update to her loan
modification status.  Plaintiff's spouse sent the following Fax to reschedule the call to the
Executive Office, seeking to speak to Mr. Grant's supervisor on Friday, March 10, 2017.

COMPLAINT FOR DAMAGES
CASE NO.

**FAX COVER SHEET**

| TO | Executive Office |
|---|---|
| COMPANY | Wells Fargo |
| FAXNUMBER | 18662781179 |
| FROM | Gwendolyn Denise Stripling |
| DATE | 2017-03-09 17:14.29 GMT |
| RE | Loan number: 0482682291 |

COVER MESSAGE

Regarding a scheduled phone call for Wednesday, March 8, 2017. We were unavailable to speak with you. We would like to reschedule for Friday, March 10, 2017 at 10:00 a.m. Pacific time. Please call 510-830-7778.

179.    Plaintiff is informed and believes and thereupon alleges that she did not speak with Mr. Anthony Grant's supervisor on March 10, 2017 or at any time after.  As a point in fact, Plaintiff left several messages with Mr. Grant asking him to please reply via phone with the name of his Supervisor.  Mr. Anthony Grant did not respond to Plaintiff's request.

180.    On March 17, 2017, Mr. Anthony Grant wrote to Plaintiff with subject "The review of your loan assistance options."  "A review of your loan has been pending for a considerable period of time and we have not yet received all of the required documentation from you.  Because you have not provided the required documentation, we are unable to offer you assistance options.

181.    On March 31, 2017, Plaintiff faxed to Mr. Anthony Grant:

## FAX COVER SHEET

| TO | AnthonyGrant |
|---|---|
| COMPANY | Wells Fargo |
| FAXNUMBER | 18665908910 |
| FROM | Gwendolyn Denise Stripling |
| DATE | 2017-03-31 02:34:46 GMT |
| RE | Loan Number: 0482682291 |

COVER MESSAGE

Subject: The Review of your loan for assistance options

To: Anthony Grant

Home Preservation Specialist

Wells Fargo Home Mortgage

Mr. Grant:

We are in receipt of your letter of March 17, 2017 stating that "we have not yet received all of the required documentation from you. Because you have not provided the required documentation, we are unable to offer you assistance options."

Mr. Grant, we provided all required documentation you requested. We diligently

182.   During the month of April, 2017 and early May, 2017 Plaintiff continued to reach out by phone to Mr. Grant.  However, on or about April 28, 2017,  WELL FARGO transferred mortgage loan ownership and servicing to Clear Recon Corp, a California corporation.

183.   On or about April 28, 2017, Clear Recon sent to Plaintiff a "Debt Validation Notice" and its intent to initiate foreclosure proceedings.

184.   On May 15, 2017, she received a letter with subject:  "Notice Pursuant to Cal. Civ.

Code § 2924.9." "We're writing to let you know that your mortgage is currently in foreclosure...." The letter was not signed but stated simply "Sincerely, Wells Fargo Home Mortgage."

185. On or about May 19, 2017 Plaintiff wrote to Clear Recon disputing the debt owed to Wells Fargo.

186. On or about May 25, 2017, Clear Recon responded via fax, "notice of a disputed debt" owed to Wells Fargo, N.A.

187. On May 25, 2017, Plaintiff sent to Tammi J. Laird, Clear Recon Corp. with a copy to Herman L. Counts III, Wells Fargo, Senior Vice President, Customer Care and Recovery Group, and Jeanifer/Jennifer Cleavenger, Wells Fargo Executive Resolution Specialist a letter disputing the debt and requesting responses to her questions regarding the debt.

188. On June 1, 2017, Mr. Anthony Grant sent to Plaintiff a letter with the following narrative: "Thank you for reach out to us about our mortgage. I am a Home Preservation Specialist and will be your personal Wells Fargo representative throughout the mortgage assistance process....To be considered for mortgage assistance, you will need to gather some required documents, complete the forms in this package, and submit your application no later than July 1, 2 017.

189. On or before June, 2017, before Plaintiff filed for Chapter 13 Bankruptcy Protection, she received a denial of her loan modification request. Plaintiff began working on an "appeal" letter. However, Clear Recon had began to escalate the foreclosure during this time period.

COMPLAINT FOR DAMAGES
CASE NO.

## H. Wells Fargo Failed to Properly Adjust Morgage Balance

190.    Plaintiff is informed and believes and thereupon alleges that Wells Fargo Failed to adjust balance, incorrectly accounting in terms of bi-weekly, leading to increase

## I. The Real Estate Settlement Procedures Act (RESPA)

191.    The Real Estate Settlement Procedures Act (RESPA) 12 U.S.C. §§ 2601, et seq permits borrower (or an agent of borrower) to submit qualified written request for information relative to federally related mortgage loan to any servicer of such loan. 12 U.S.C. § 2605(e)(1).

192.    RESPA provides that not later than 30 days (excluding legal public holidays, Saturdays, and Sundays) after the receipt from any borrower of any qualified written request... the servicer shall...provide the borrower with written explanation or clarification that includes the information requested by the borrower or an explanation of why the information requested is unavailable or cannot be obtained by the servicer; and the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower. 12 U.S.C. 2605(e)(2); 12 U.S.C. 2605(e)(2)(C); 12 U.S.C. § 2605(e)(2)(C)(i) (ii).

193.    In January 2013, the Consumer Finance Protection Bureau (CFPB) issued number of final rules concerning mortgage markets in the United States, pursuant to the authority granted by the Dodd-Frank Wall Street Reform and Consumer Protection Act Public Law No. 111-203, 124 Stat. 1376 (2010) which amended RESPA.

194.    The CFPB RESPA Mortgage Servicing Final Rules known as Regulation and codified as 12 CFR 102 were issued on January 17, 2013, and became effective on January 10, 2014. 9. Through Regulation X, the CFPB has provided guidance for the interpretation of the foregoing

RESPA provisions.

195.    Specifically, relative to RFIs, Regulation provides that servicer shall comply with the requirements of this section for any written request for information from borrower that includes the name of the borrower, information that enables the servicer to identify the borrower mortgage loan account, and states the information the borrower is requesting with respect to the borrower mortgage loan. 12 CFR 1024.36(a).

196.    12 CFR § 1024.36(d)(1) provides that servicer must respond to RFI by either [p]roviding the borrower with the requested information and contact information, including telephone number, for further assistance in writing or [c]onducting reasonable search for the requested information and providing the borrower with written notification that states that the servicer has determined that the requested information is not available to the servicer, provides the basis for the servicer's determination, and provides contact information, including telephone number, for further assistance.

197.    Notwithstanding the above, Regulation provides for certain exceptions to servicers obligations to respond to RFIs. Specifically, 12 CFR 1024.36(f)(1) provides that servicer does not have to comply with 12 CFR 1024.36(d) if the request seeks substantially the same information as prior request, the information sought is confidential, proprietary, or privileged, the information is not directly related to the borrower specific mortgage loan account, or the request is overbroad or unduly burdensome.

198.    If servicer determines that it is exempted from responding to an RFI, pursuant to 12 CFR 1024.36(f)(1), Regulation requires the servicer to notify the borrower of its determination in writing not later than five days (excluding legal public holidays, Saturdays, and Sundays) after

making such determination, setting forth the specific basis under paragraph (f)(1) of this section upon which the servicer has made such determination. 12 CFR 1024.36(f)(2).

**J. TILA**

199.    California Civil Code Section § 2923.6 prohibits "dual tracking." **Dual tracking** is an

**K. Home Affordable Modification Program Violation**

200.    Introduced pursuant to the Emergency Economic Stabilization Act of 2008, the Home Affordable Modification Program (HAMP) was designed to provide help to homeowners during the Great Recession.  HAMP required mortgage servicers to offer loan modifications to borrowers who met certain threshold requirements. These modifications would lower a borrower's mortgage payments to a manageable level (typically 31 percent of the borrower's monthly income) and allow the borrower to avoid foreclosure.

201.    Plaintiff met the threshold requirements for a mortgage modification and as their mortgage servicer, Wells Fargo Bank, was required to offer them a loan modification. Wells Fargo failed to do so, however, and instead attempted to foreclose on Plaintiff's home - not once, but twice.  To stave off foreclosure, Plaintiff was forced into bankruptcy.

202.    For years, Wells Fargo failed to verify or audit its loan modification software to ensure it was properly calculating homeowners' eligibility for government-mandated mortgage modifications. Material errors remained uncorrected in the software for five to eight years, if not longer.

203.    The federal government cited Wells Fargo in 2011 for failing to adequately audit its mortgage modification and foreclosure procedures, and Wells Fargo's Board and executive leadership promised to implement ongoing testing to ensure that the Bank complied with

government requirements in the future. But they failed to live up to that promise and multiple errors in Wells Fargo's decision-making software remained unaddressed.

204.    Wells Fargo's leadership failed to implement adequate testing even after the government found that another error in the Bank's software had led the Bank to wrongfully deny mortgage modifications in 2013-2014. Wells Fargo was cited again for failing to properly oversee the Bank's mortgage modification and foreclosure operations, but still did nothing to stop others like Plaintiffs from being wrongfully denied mortgage modifications and foreclosed upon.

205.    Not until 2015 did Wells Fargo discover one of the errors that led it to wrongfully deny mortgage modifications to Plaintiffs and hundreds of other homeowners. But rather than coming clean, Wells Fargo kept its discovery secret—likely in an effort to avoid additional government penalties. The government had previously imposed restrictions on Wells Fargo's mortgage servicing business and announced fines, with the amount of the fine and the duration of business restrictions dependent on the length and severity of the Bank's continued non-compliance. Had Wells Fargo disclosed another scandal that led it to unlawfully deny mortgage modifications to hundreds of customers, the government likely would not have lifted its business restrictions in 2016 and would have imposed a far more severe penalty than the $70 million fine it ultimately issued.

## TOLLING ALLEGATIONS

206.    The causes of actions alleged herein did not accrue or were tolled until Plaintiff discovered, or could have discovered with the exercise of reasonable diligence, the facts giving rise to her legal claims

207.    Plaintiff was not aware that she qualified for a mortgage modification, and that Wells

Fargo's automated decision-making tool had miscalculated her eligibility.

208.    Plaintiffs had no realistic ability to discover these facts on her own. Wells Fargo's automated decision-making tool is not public, and the mathematical calculations used to determine eligibility for a mortgage modification depended on variables within Wells Fargo's exclusive control.

209.    Any applicable statutes of limitations are also tolled by Wells Fargo's knowing, active, and ongoing concealment of the facts alleged herein. Wells Fargo discovered one of the software errors in October 2015 but deliberately concealed its discovery from Plaintiff. Wells Fargo was under a continuous duty to disclose the truth to Plaintiff and Plaintiff reasonably relied on Wells Fargo's ongoing concealment.

## FIRST CAUSE OF ACTION
### CALIFORNIA CIVIL CODE § 2954.4
### (AGAINST ALL DEFENDANTS)

210.    Plaintiff is informed and believes and thereupon alleges each of the allegations contained in paragraphs above with the same force and effect as if fully set forth at length herein.

211.    California Civil Code Section § 2954.4(b), which applies to loans secured by single-family owner-occupied dwellings, states:

> (b) A late charge may not be imposed on any installment which is paid or tendered in full on or before its due date, or within 10 days thereafter, even though an earlier installment or installments, or any late charge thereon, may not have been paid in full when due. For the purposes of determining whether late charges may be imposed, any payment tendered by the borrower shall be applied by the lender to the most recent installment due.

212.    On or about June 23, 2005, Plaintiff and World Savings entered into an agreement with terms memorialized in a Promissory Note and Deed of Trust. Wachovia became a party to

the contracts as successor and/or assignee.  On or about November 1, 2009, Wachovia converted

to a national bank with the name Wells Fargo BANK South West National Association.  On that

same date, Wachovia merged with and into Wells Fargo BANK.

213.    Wells Fargo has serviced Plaintiff's loan at all times material hereto.

214.    The Note and Deed of Trust are industry standard form documents.  Industry practice

does not allow borrowers an opportunity to make changes to the Note or Deed of Trust.  The

Note and Deed of Trust are presented on a "take it or leave it" basis.  Consistent with industry

practice, Plaintiff was not provided an opportunity to make any changes to the Note or Deed of

Trust and was offered them on a "take it or leave it it" basis.  Given the superior bargaining

power of the industry and its lenders, the Note and Deed of Trust are contracts of adhesion.

215.    Because the Note and Deed of Trust were made in California and concern property in

California, the prohibition contained in California Civil Code Section 2954.4 is incorporated into

the Note and Deed of Trust.

216.    Wells Fargo  violated California Civil Code Section 2954.4 by:

(1)  Charging late fees even when they received bi-weekly payments of interest and

principal due before the due date;

(2)  Charging late fees during the grace period.

217.    As a direct and proximate result of Wells Fargo's violation of California Civil Code

Section § 2954.4, Plaintiff has been harmed, including, but not limited to, incurring excessive late

charges, having those same late fees impact her past due balance which led to an increase in the

total outstanding balance, and monies that are unknown due to the data integrity issues inherent in

Plaintiff's data servicing file. Plaintiff has been living in a state of stressful anxiety due to significant stress and emotional distress because of Wells Fargo's actions throughout the ownership and servicing of her loan.

**SECOND CAUSE OF ACTION**
**CALIFORNIA CIVIL CODE § 2923.7**
**(AGAINST ALL DEFENDANTS)**

218.    Plaintiff is informed and believes and thereupon alleges each of the allegations contained in paragraphs above with the same force and effect as if fully set forth at length herein.

219.    Wells Fargo assigned Mr. Anthony Grant as Plaintiff's Home Preservation Specialist.

220.    California Civil Code § 2923.7 provides:

(a)  Upon request from a borrower who requests a foreclosure prevention alternative, the mortgage servicer shall promptly establish a single point of contact and provide to the borrower one or more direct means of communication with the single point of contact.

(b) The single point of contact shall be responsible for doing all of the following:

(1) Communicating the process by which a borrower may apply for an available foreclosure prevention alternative and the deadline for any required submissions to be considered for these options.

(2) Coordinating receipt of all documents associated with available foreclosure prevention alternatives and notifying the borrower of any missing documents necessary to complete the application.

(3) Having access to current information and personnel sufficient to timely, accurately, and adequately inform the borrower of the current status of the foreclosure prevention alternative.

(4) Ensuring that a borrower is considered for all foreclosure prevention alternatives offered by, or through, the mortgage servicer, if any.

(5) Having access to individuals with the ability and authority to stop foreclosure proceedings when necessary.

(c) The single point of contact shall remain assigned to the borrower's account until the

mortgage servicer determines that all loss mitigation options offered by, or through, the mortgage servicer have been exhausted or the borrower's account becomes current;

(d) The mortgage servicer shall ensure that a single point of contact refers and transfers a borrower to an appropriate supervisor upon request of the borrower, if the single point of contact has a supervisor.

221.   Wells Fargo violated California Civil Code § 2923.7 by:

(1)  Failing to coordinate the receipt of all documents associated with her loan modification;

(2)  Failing to have access to current information and personnel sufficient to timely, accurately, and adequately inform the Plaintiff of the current status of the foreclosure prevention alternative;

(3)  Failing to ensure that Plaintiff was considered for all foreclosure prevention alternatives offered by, or through, the mortgage servicer, if any;

(4)  Failing to have access to individuals with the ability and authority to stop foreclosure proceedings when necessary;

(5)  Failing to ensure that Plaintiff's single point of contact referred and transferred Plaintiff to an appropriate supervisor upon request of the borrower.

222.   As a direct and proximate result of Wells Fargo's violation of California Civil Code Section § 2923.7, Plaintiff has been harmed.  Mr. Grant's actions caused Plaintiff to not receive consideration of the loan modification in a timely manner, thus forcing her to seek Chapter 13 Bankruptcy protection to fend off foreclosure.

### THIRD CAUSE OF ACTION
### CALIFORNIA CIVIL CODE § 2923.6
### (AGAINST ALL DEFENDANTS)

223.    Plaintiff is informed and believes and thereupon alleges each of the allegations contained in paragraphs above with the same force and effect as if fully set forth at length herein.

224.    California Civil Code Section § 2923.6 prohibits "dual tracking." To wit, while a borrower's complete application for a first lien loan modification is pending, the servicer may not record a notice of default, notice of trustee's sale, or conduct a trustee's sale.

225.    For purposes of this section, an application shall be deemed "complete" when a borrower has supplied the mortgage servicer with all documents required by the mortgage servicer within the reasonable timeframes specified by the mortgage servicer.

226.    Plaintiff submitted a complete application to Wells Fargo within the timeframe specified.

227.    Wells Fargo acknowledged receipt of Plaintiff's mortgage assistance application.

228.    Plaintiff submitted one additional supporting document requested by Wells Fargo within the timeframe specified.

229.    Wells Fargo acknowledged receipt of the one additional supporting document.

230.    Plaintiff is informed and believes and thereupon alleges that the loss mitigation package sent to Wells Fargo in February, 2017 was complete as required by statute.

231.    Wells Fargo recorded a notice of default and began foreclosure proceedings while Plaintiff's loan modification was still pending and under loss mitigation review.

232.    Wells Fargo violated California Civil Code Section  2923.6 by:

    (1) Making a determination that Plaintiff was not eligible for a first lien loan modification by assigning the Deed of Trust to Clear Recon, who began foreclosure proceedings while her loan was still under loss mitigation review with Wells Fargo;

COMPLAINT FOR DAMAGES
CASE NO.

(2) Recording a notice of default during thirty-one day post-denial period;

(3) Not providing if the denial was based on investor disallowance, the specific reasons for the investor disallowance;

(4) Not providing if the denial was the result of a net present value calculation, the monthly gross income and property value used to calculate the net present value and a statement that the borrower may obtain all of the inputs used in the net present value calculation upon written request to the mortgage servicer;

(5) Not providing a description of other foreclosure prevention alternatives for which the Plaintiff may have been eligible;

(6) Not providing a list of the steps the Plaintiff could have taken in order to be considered for those other options.

(7) Misrepresenting the "spirit" of the statute, namely when Mr. Grant represented and promised that her loan would not be "dual-tracked."

233.     As a direct and proximate result of Wells Fargo's violation of California Civil Code Section § 2923.6, Plaintiff has been harmed. Plaintiff lost the opportunity to potentially modify her loan and payment terms that were available under the many loss mitigation programs that were Federally funded and by which Wells Fargo received funds for "review" but not for "completion" of loan modifications. In addition, the dual tracking "timing" of Wells Fargo's actions forced Plaintiff to file for Chapter 13 protection to fight the foreclosure proceedings initiated by Wells Fargo and Clear Recon. Plaintiff experienced a state of stressful anxiety due to the significant stress and emotional distress because of Wells Fargo's dual tracking and representation that the loan was not being "dual tracked." Plaintiff also incurred attorney fees and

Chapter 13 Bankruptcy fees.

## FOURTH CAUSE OF ACTION
### BREACH OF CONTRACT (DEED OF TRUST/NOTE)
### (AGAINST ALL DEFENDANTS)

234.   Plaintiff is informed and believes and thereupon alleges each of the allegations contained in paragraphs above with the same force and effect as if fully set forth at length herein.

235.   A cause of action for breach of contract requires proof of the following elements: (1) existence of the contract; (2) plaintiff's performance or excuse for nonperformance; (3) defendant's breach; and (4) damages to plaintiff as a result of the breach.

236.   On or about June 23, 2005, Plaintiff's and World Savings entered into an agreement with terms memorialized in a Promissory Note and Deed of Trust.  Wachovia became a party to the contracts as successor and/or assignee.  On or about November 1, 2009, Wachovia converted to a national bank with the name Wells Fargo BANK South West National Association.  On that same date, Wachovia merged with and into Wells Fargo BANK.

237.   Wells Fargo has serviced Plaintiff's loan at all times material hereto.

238.   Plaintiff fully performed her obligations under the contract, including making her monthly loan payments and real property taxes, and maintaining insurance.

239.   Plaintiff performed pursuant to the Note requirements until Wells Fargo breached the contract by changing the payment amount due and increased Plaintiff's bi-weekly mortgage payment in October, 2008 from $1,710.23 to $2,338.60 in November, 2008 "overnight." Plaintiff's monthly total increased from $3,420.46 in October, 2008 to $4,677.20 in November, 2008.  The bi-weekly difference between payment increased from $119.27 in October, 2008 to

$628.37.  The monthly difference between payments increased from $238.54 to $1,256.74.

240.    Wells Fargo also breached the terms of the contract by:

(1) Changing the payment date-change anniversary from every 52 weeks to an arbitrary date;

(2) Removing the "Pick-A-Pay" option that allowed Plaintiff to select among three different payment options;

(3) Charging late fees even when they received bi-weekly payments of interest and principal due before the due date or during the grace period, as alleged herein.  The pyramiding of fees by Wells Fargo, charging late fees for each monthly payment missed, was in violation of California Civil Code §2954.4.  Because the Note and Deed of Trust were made in California and concern property in California, the prohibition contained in California Civil Code Section 2954.4 is incorporated into the Note and Deed of Trust.

(4) Improperly applying  payments made by Plaintiff and holding her payments in "suspense accounts" and "unapplied funds"  for egregious and capricious periods of duration and not applying them to principal, interest, and other payments per the contract.

241.    Arbitrarily modifying the payment amount "overnight" rendered performance on the part of Plaintiff impossible and caused her economic risk and harm, causing her to file for Chapter 13 Bankruptcy protection because she could not maintain the increased payments aggressively thrust upon her.  Plaintiff has been damaged as the result of Wells Fargo's breach of

contract.

242.   As a direct and proximate result of Wells Fargo's breach of the Deed of Trust and the Note, improper late fees were assessed to Plaintiff's mortgage, monies paid by Plaintiff to pay the bi-weekly mortgage were either not applied or misapplied, and with other outrageous acts as alleged herein, Plaintiff was economically harmed, emotionally harmed, and physically harmed.

## FIFTH CAUSE OF ACTION
## CONTRACTUAL BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING
## (AGAINST ALL DEFENDANTS)

243.   Plaintiff is informed and believes and thereupon alleges each of the allegations contained in paragraphs above with the same force and effect as if fully set forth at length herein.

244.   On or about June 23, 2005, Plaintiff and World Savings entered into an agreement with terms memorialized in a Promissory Note and Deed of Trust.  Wachovia became a party to the contracts as successor and/or assignee.  On or about November 1, 2009, Wachovia converted to a national bank with the name Wells Fargo BANK South West National Association.  On that same date, Wachovia merged with and into Wells Fargo BANK.

245.   Wells Fargo has serviced Plaintiff's loan at all time material hereto.

246.   Plaintiff alleges that at all times there existed an implied covenant of good faith and fair dealing represented by the terms of the Promissory Note, and the Deed of Trust which imposed upon Wells Fargo a duty of good faith and fair dealing in this matter to safeguard,

protect, or otherwise care for the assets and rights of Plaintiff. Said covenant prohibited Wells Fargo from activities interfering with, or contrary to, the rights of Plaintiff.

247.    In addition, Wells Fargo enjoyed substantial discretionary power affecting the rights of Plaintiff during the events alleged in this complaint; Wells Fargo was required to exercise such power in good faith.

248.    Wells Fargo is obligated by contract and common law to act in good faith and to deal fairly with Plaintiff.

249.    Wells Fargo breached the covenant of good faith and fair dealing by:

(1) Changing Plaintiff's bi-weekly payment amount in November 2008;

(2) Charging fees and costs not allowed under the Deed of Trust and Note or under California law;

(3) Ignoring grace periods allowed under the Deed of Trust and Note or under California law;

(4) Improperly applying mortgage payments;

(5) Misappropriating mortgage payments;

(6) Intentionally delaying the processing of her loan modification;

(7) Intentionally or negligently misrepresenting the importance and effect of correspondence and legal documents evincing that Wells Fargo was proceeding with foreclosure while the Subject Loan was supposedly in review for a loan modification;

(8) Intentionally delaying a response to her qualified written request for a loan history; which it took 184 days for Wells Fargo to provide.

COMPLAINT FOR DAMAGES
CASE NO.

(9) Intentionally not responding to her letter of February 16, 2017 questioning the mortgage balance, past due balance, and other items related to her mortgage;

(10) Intentionally not investigating questions Plaintiff raised in her letter of February 16, 2017, where she questioned the veracity and data integrity of the mortgage balance, past due balance, and other items related to her mortgage;

(11) Including a paid in full Chapter 13 obligation in a past due mortgage loan balance and presenting it as a current obligation to Plaintiff;

250. Wells Fargo—and not the Plaintiff—knew of its policy to change payment amounts without notice, pyramid late fees, ignore grace periods, improperly apply mortgage payments, and include a paid in full Chapter 13 obligation in a past due mortgage loan balance and used that knowledge to its economic advantage.

251. Wells Fargo also routinely and regularly breached this duty by:

(1) Failing to perform loan servicing functions consistent with its responsibilities to Plaintiff;

(2) Failing to supervise its agents and employees properly including, without limitation, its loss mitigation and collection personnel and its foreclosure attorneys;

(3) Routinely demanding information it had already received;

(4) Failing to follow through on written and implied promises;

(5) Encouraging and/or allowing employees to make inaccurate representations.

252. These actions constitute bad faith by Wells Fargo.

253. On information and belief, Wells Fargo financially benefited from its breaches in a variety of ways, all for its own economic benefit, including but not limited to first obtaining fees

that were improperly assessed then obtaining greater fees from foreclosing than from modifying Plaintiff's loan.

254.    Wells Fargo acted with a dishonest purpose and deliberately engaged in wrongdoing and unfair treatment of Plaintiff.

255.    Wells Fargo's performance and actions were arbitrary, capricious, and in breach of its obligations of good faith dealing.

256.    As a result of these failures to act in good faith and the absence of fair dealing, Wells Fargo caused Plaintiff harm.

257.    Plaintiff suffered the harm of attorney fees to avoid foreclosure and other costs and monies that are unknown due to the data integrity issues inherent in the data servicing file. Plaintiff has been living in a state of stressful anxiety due to significant stress and emotional distress because of Wells Fargo's action throughout the ownership and servicing of her loan.

## SIXTH CAUSE OF ACTION
### UNFAIR BUSINESS PRACTICES
### (AGAINST ALL DEFENDANTS)

258.    Plaintiff is informed and believes and thereupon alleges each of the allegations contained in paragraphs above with the same force and effect as if fully set forth at length herein.

259.    California Business & Professions Code § 17200, et seq. concerns unfair competition and prohibited activities and states that "unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice."

260.    Wells Fargo has engaged in, and continues to engage in a pattern and practice of conduct that constitutes unfair business practices and unfair competition as defined under Section

17200 of the Business and Professions Code.

261.    The conduct of Wells Fargo, as set forth in the allegations in this complaint, constitutes unfair, unlawful and/or fraudulent business practices under California Business and Professional Code § 17200, *et seq*.

262.    Wells Fargo's conduct alleged herein is unlawful in that it violates California law, including, but not limited to California Civil Code § 2954.4, California Civil Code § 2923.6, and California Civil Code § 2923.7.

263.    Wells Fargo'S conduct alleged herein is unfair within the meaning of California Business and Professions Code § 17200, *et seq.*  Wells Fargo's business practices, as alleged herein, are "unfair" because they offend established public policy and/or are immoral, unethical, oppressive, unscrupulous and/or substantially injurious to its customers.  Wells Fargo's conduct alleged herein is unfair because, among other reasons, Wells Fargo arbitrarily changed and ignored mortgage terms, improperly applied mortgage payments, engaged in "dual tracking," proceeding with foreclosure while the loan modification application was pending, failed to perform loss mitigation efforts in good faith, intentionally or negligently failed to process submissions, failed to honor the loan modification denial appeal period, and converted mortgage monies by including paid in full Chapter 13 Bankruptcy funds into past due loan balances for future payments.

264.    Wells Fargo's conduct as alleged herein is fraudulent within the meaning of California Business and Professions Code § 17200, *et seq.*  Wells Fargo's business practices, as alleged herein, are fraudulent because among other actions, they are likely to deceive consumers, including Plaintiff, into believing mortgage terms were adhered to, that mortgage payments were

properly applied, that "dual tracking" would not occur, and that mortgage monies paid in full during a Chapter 13 Bankruptcy would not still be included as a past due balance for future payments to Wells Fargo.

265.   California Residential Mortgage Lending Act (CRMLA), California Financial Code § 50503(a)(2) provides that: It is a violation for any person subject to this law or any director, partner, shareholder controlling an ownership interest of 10 percent or more, trustee, officer, agent, or employee of any such person (2) Knowingly or recklessly make or cause to be made any misstatement or omission of a material fact, pertaining to a loan or loan servicing.

266.   On December 31, 2014, the **Plaintiff's past due loan balance increased from $54,757.80 to $132,437.78**.   On August 31, 2015, the **past due balance increased from $56,942316 to $102,555.44 dollars**.   On September 4, 2015, the **past due balance increased from $50,883.60 to $243,132.70 dollars**.   On September 7, 2015, the **past due balance increased from $243,132.70 to $246,150.99 dollars**.   On October 1, 2015, the **past due balance increased from $246,150.99 to $249,169.48 dollars**.   In addition, Plaintiff recently discovered that $14,068.50, an amount she paid from 2011 - 2016 as part of her Chapter 13 Bankruptcy plan, was still being included in her current past due balance.

267.   Wells Fargo violated the California Residential Mortgage Lending Act California Financial Code § 50503(a)(2) knowingly or recklessly making or causing to be made a misstatement and omission of a material fact pertaining to her loan and its loan servicing. Plaintiff is informed and thereupon alleges that Wells Fargo failed to provide notice of the aforementioned data integrity issues where the past due balance increased exorbitantly and hid this material fact and its adverse impact on her loan.  Plaintiff is informed and thereupon alleges

that Wells Fargo failed to provide a letter or notice of explanation of how these aforementioned

data integrity issues impacted her loan balance, interest calculation, escrow calculation, or may

have led to an overstatement of her past due loan balance.

268.    Wells Fargo engaged in unlawful practices by denying mortgage modifications to

Plaintiffs in violation of HAMP and other governmental requirements.

269.    As a direct and proximate result of the aforementioned acts, Wells Fargo received

monies and continues to hold monies received by Plaintiff.

270.    As a direct and proximate result of Wells Fargo's conduct, as alleged herein, Plaintiff

has suffered injury in fact and has lost money and suffered and continues to suffer emotional

distress, anxiety, and fear as a result of Wells Fargo's unlawful, unfair and fraudulent business

acts and practices.

271.    On behalf of the general Public, Plaintiff requests that this court order that Wells

Fargo be required to disgorge the profits it has wrongfully obtained through the use of these

unfair, unlawful and/or fraudulent practices, and provide restitution.

272.    Plaintiff also seeks declaratory, injunctive, and other available relief necessary to

protect Plaintiff from the unfair business practices of Wells Fargo.


### SEVENTH CAUSE OF ACTION
### UNJUST ENRICHMENT
### (AGAINST ALL DEFENDANTS)

273.    Plaintiff is informed and believes and thereupon alleges each of the allegations

contained in paragraphs above with the same force and effect as if fully set forth at length herein.

274.    Wells Fargo actively participated in a scheme whereby it unlawfully and unfairly

changed and/or ignored mortgage terms, improperly applied mortgage payments, engaged in "dual tracking" during a loan modification process, and converted mortgage monies by including paid in full Chapter 13 Bankruptcy funds into past due loan balances for future payments. Wells Fargo knew and was aware of the unfair and/or deceptive acts and business practices.

275.    Wells Fargo concealed the true facts and circumstances from Plaintiff.

276.    By wrongfully changing and ignoring mortgage terms, improperly applying mortgage payments, engaging in "dual tracking" during a loan modification process, and converting mortgage monies by including paid in full Chapter 13 Bankruptcy funds into past due balances for future payments, Wells Fargo was unjustly enriched at the expense of Plaintiff.

277.    Wells Fargo knew the benefit they were receiving as a result of its wrongful acts, and has enjoyed the benefit of its financial gains, to the detriment and the expense of Plaintiff.

278.    Retention of the monies gained through its wrongful acts and practices would be inequitable considering the circumstances by which Wells Fargo obtained those monies.

279.    The actions described in this complaint by Wells Fargo were done with a conscious disregard of Plaintiff's rights. These actions constitute conduct which is despicable behavior done with an intent to injure Plaintiff, such as to constitute oppression, fraud or malice under California Civil Code § 3294, entitling Plaintiff to punitive damages.

280.    Restitution alone would have little or no deterrent effect on Wells Fargo, and without an award of exemplary damages, Wells Fargo would be incentivized to pursue other malicious, oppressive and fraudulent schemes.

281.    Plaintiff is entitled to and seek restitution and punitive damages from Wells Fargo and an order disgorging all profits, benefits, and other compensation obtained by Wells Fargo for

their wrongful conduct.

## EIGHTH CAUSE OF ACTION
### NEGLIGENT MISREPRESENTATION
### (AGAINST ALL DEFENDANTS)

282.    Plaintiff is informed and believes and thereupon alleges each of the allegations

contained in paragraphs above with the same force and effect as if fully set forth at length herein.

283.    Wells Fargo represented to Plaintiff that a fact was true; namely that Vice President

Carolyn Romo, Wells Fargo Home Mortgage, in a letter of August 20, 2015, assured Plaintiff that

her mortgage payments, due dates, or payment history would not be impacted by a mortgage

account system change.  She wrote that:

   a.  **"We're writing to let you know about an upcoming change to the system within Wells
       Fargo Home Mortgage** that may temporarily impact access to the mortgage account
       information for the above account....**we'd like to assure that this one-time operational
       change will not affect the mortgage payments, the due dates for those payments, or
       the payment history."**

   b.  **"We're simply moving the mortgage account from one of our systems to another**."

284.    Plaintiff is informed and believes and thereupon alleges that Wells Fargo's that the

following representation was also true, where on May 8, 2014, Wells Fargo sent a letter to

Plaintiff stating that "your account statement for January may not have displayed the most recent

transaction activity... **"the error did not impact the servicing of your loan... We're working

to resolve the issue before your next statement generates.**

285.    Plaintiff is informed and believes and thereupon alleges that both of Wells Fargo's

representations were not true because on August 31, 2015, the **past due balance increased from

$56,942316 to $102,555.44 dollars**.  On September 4, 2015, the **past due balance increased**

from $50,883.60 to $243,132.70 dollars. On September 7, 2015, the **past due balance increased from $243,132.70 to $246,150.99 dollars**. And on October 1, 2015, the **past due balance increased from $246,150.99 to $249,169.48 dollars**.

286.    Although Wells Fargo may have honestly believed that the representations were true, Wells Fargo had no reasonable grounds for believing the representation was true when it was made given the complex and technical nature of its backend loan management and servicing system architecture.

287.    Wells Fargo intended that Plaintiff rely on this representation.

288.    Plaintiff reasonably relied on Wells Fargo's representation.

289.    As a direct and proximate result of Wells Fargo's negligent misrepresentation, Plaintiff was harmed. Plaintiff's loan servicing file may still contain "dirty data" as she is unable to determine the correct past due balance, how that past due balances impacted interest calculation, and what fees were assessed. Plaintiff is thus economically harmed in some unknown quantity that cannot be ascertained due to the data integrity issues. Plaintiff is also suffering emotional stress, anxiety, and fear.

290.    Plaintiff's reliance on Wells Fargo's representation was a substantial factor in causing her harm.

### NINTH CAUSE OF ACTION
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (AGAINST ALL DEFENDANTS)

291.    Plaintiff is informed and believes and thereupon alleges each of the allegations contained in paragraphs above with the same force and effect as if fully set forth at length herein.

292.    The conduct complained of hereinabove was outside the conduct expected to exist in a lender/borrower relationship, was intentional and malicious and done for the purpose of causing Plaintiff to suffer mental anguish, emotional, and physical distress.

293.    Wells Fargo's conduct, in confirming and ratifying the complained of conduct in its employees and their abuse of process, was done with the knowledge that Plaintiff's emotional and physical distress would thereby increase, and was done with a wanton and reckless disregard of the consequences to Plaintiff.

294.    Wells Fargo's conduct as hereinabove alleged, acted fraudulently, maliciously, oppressively and with reckless disregard of Plaintiff's mortgage rights, and thereby entitling Plaintiff to an award of punitive damages.

295.    Wells Fargo knew of the wrongful conduct complained of herein, but failed to take immediate and appropriate corrective action to remedy the situation and thereby acted fraudulently, maliciously, oppressively and with reckless disregard of Plaintiff's mortgage rights, and thereby entitling Plaintiff to an award of punitive damages.

296.    As a direct and proximate result of Wells Fargo's conduct, Plaintiff was caused to suffer, and continues to suffer from anxiety, severe emotional distress, worry, and fear that Wells Fargo will continue to abuse its lender position to change payment terms, change mortgage payments, and other unlawful and unfair egregious acts as alleged herein.

297.    Wells Fargo did the things hereinabove alleged, intentionally, oppressively, and maliciously with an evil and malevolent motive to injure Plaintiff.

## TENTH CAUSE OF ACTION
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (AGAINST ALL DEFENDANTS)

298.   Plaintiff is informed and believes and thereupon alleges each of the allegations contained in paragraphs above with the same force and effect as if fully set forth at length herein.

299.   In the alternative, if said conduct of Wells Fargo, and of their agents and employees was not intentional, it was negligent and Plaintiff is thereby entitled to general damages for the negligent infliction of emotional distress.

300.   As a direct and proximate result of Wells Fargo's conduct, Plaintiff was caused to suffer, and continues to suffer from anxiety, severe emotional distress, worry, and fear that Wells Fargo will continue to abuse its lender position to change payment terms, change mortgage payments, and other unlawful and unfair egregious acts as alleged herein.

## ELEVENTH CAUSE OF ACTION
## THE REAL ESTATE SETTLEMENT PROCEDURES ACT AND REGULATION X
### (AGAINST ALL DEFENDANTS)

301.   Plaintiff is informed and believes and thereupon alleges each of the allegations contained in paragraphs above with the same force and effect as if fully set forth at length herein.

302.   Wells Fargo is a mortgage servicer as that term is defined by 12 CFR 1024.2(b) and 12 U.S.C. 2605(i)(2).  During the time encapsulated in this Complaint, Wells Fargo was the servicer of Plaintiff's notes and mortgage on real property that secure that note (collectively referred to hereinafter as the loan ).

303.   Plaintiff's loan is a federally related mortgage loan as said term is defined by RESPA and Regulation X. 12 U.S.C. 2602(1); 12 CFR 1024.2(b).

COMPLAINT FOR DAMAGES
CASE NO.

304.    As such, Wells Fargo is subject to the requirements of RESPA and Regulation X, and does not qualify for the exception for small servicers as defined by 12 CFR § 1026.41(e)(4) nor for the exemption for qualified lender as defined by 12 CFR§ 617.700.

305.    Plaintiff submitted RFIs to Wells Fargo, which were qualified written requests, as that term is defined by 12 U.S.C. 2605(e)(1)(B).

306.    Wells Fargo failed to provide timely and adequate responses to Plaintiff RFIs.

307.    As a direct and proximate result of Wells Fargo's conduct, Plaintiff was caused to suffer, and continues to suffer from anxiety, severe emotional distress, worry, and fear that Wells Fargo will continue to abuse its lender position to change payment terms, change mortgage payments, and other unlawful and unfair egregious acts as alleged herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendant:

    A.  For attorney fees and costs of suit legal representation retained.

    B.  For general, special, and statutory damages.

    C.  For punitive damages.

    D.  For such other and further relief as the Court may deem just and  proper.

Respectfully submitted,

DATE May 21, 2019

SIGNATURE OF PLAINTIFF


Nada Velimirovic'

PLAINTIFF'S NAME
In Pro Per

COMPLAINT FOR DAMAGES
CASE NO.